AXION CORPORATION *vs.* G. D. C. LEASING CORPORATION
(and two companion cases).

Suffolk.    March 5, 1971. — May 11, 1971.

Present: TAURO, C.J., SPALDING, SPIEGEL, REARDON, & BRAUCHER, JJ.

*Sale,* Acceptance of goods, Rejection of goods, Revocation of acceptance,
Warranty.

Evidence in an action merely that a buyer gave a seller a purchase order
"To Design and Build" a valve testing machine and accepted and
paid for it, that later the buyer ordered together a second and a third
machine, which were delivered together, and accepted and paid for
the second machine, and that the seller took the third machine back
separately to work on it did not require a ruling of law that the second
and third machines constituted a single "commercial unit" within
G. L. c. 106, § 2–105 (6), or that one machine was not a commercial
unit. [477–478]
Evidence in an action that the buyer of a valve testing machine did not
inform the seller until eight months after receiving it that the buyer
would not pay therefor unless the machine met certain standards,
and did not notify the seller until six months more that the buyer
rejected the machine, required a ruling as matter of law that the notifi-
cation was not "seasonable" and the rejection was not "within a reason-
able time" under G. L. c. 106, § 2–602 (1), and the buyer must be
deemed to have accepted the machine under § 2–606 (1) (b), even if
the machine was complicated and one of the first of its kind. [478–479]
In an action by a seller to recover the price of a valve testing machine
accepted by the buyer, there was no merit in a contention by the
buyer that as a matter of law or as a matter of fact it was entitled under
G. L. c. 106, § 2–608 (1) to revoke its acceptance by reason of non-
conformity of the machine with a tolerance specification of the sales
contract where there was an absence of evidence at the trial that the
alleged failure of the machine to meet the specification "substantially"
impaired its value to the buyer. [479–481]
In an action by a seller to recover the price of a valve testing machine
accepted by the buyer, letters written by the seller did not justify
a conclusion that it made express warranties by "affirmation of fact"
or "promise" within G. L. c. 106, § 2–313 (1) (a), that the machine
would operate "100 per cent from the day" the buyer received it, or
would be more accurate in testing valves than the hand method pre-
viously employed [481–482]; nor did the evidence establish that the

buyer's version of a tolerance specification of the sales contract became "part of the basis of the bargain" within § 2–313 (1) (a) [482–483].

In an action by a seller to recover the price of a valve testing machine which was a "semi-experimental" prototype in the design of which the buyer was actively involved, the evidence did not justify a conclusion that there was an implied warranty of merchantability under G. L. c. 106, § 2–314, that the machine would operate accurately within a tolerance specification of the sales contract [483–484]; nor was a conclusion justified that there was an implied warranty of fitness for a particular purpose under c. 106, § 2–315, in the absence of evidence that the seller had reason to know of any particular purpose at the time of contracting and of evidence that the buyer relied on the seller's skill or judgment [484].

TWO ACTIONS OF CONTRACT AND ONE ACTION OF CONTRACT OR TORT. Writs in the Superior Court dated June 15, 1966, December 1, 1966, and March 1, 1968.

The cases were tried before *Thompson,* J.

*Robert W. Harrington* for G. D. C. Leasing Corporation & another.

*Frederic N. Halstrom* (*Albert P. Zabin* with him) for Axion Corporation.

BRAUCHER, J. These cases arise out of the sale of three valve testing machines. The three machines were delivered and two of them were paid for. The seller brings two actions of contract for failure to pay for the third machine, and the buyer brings an action of contract or tort against the seller for damages for breach of express and implied warranties.[1] The cases were consolidated for trial by jury. At the close of the evidence the judge denied the buyer's motions for directed verdicts in the two cases brought by the seller, and allowed the seller's motions for directed verdicts in all three cases. The cases are here on the buyer's exceptions to these actions.

The following facts are substantially undisputed except as indicated. Negotiations began in late 1963, and included a good deal of correspondence. The buyer's purchase order,

---

[1] The companion cases are Axion Corporation (the seller) *vs.* Webster Valve Company, Inc. (the buyer), and Webster Valve Company, Inc. *vs.* Axion Corporation. After the second and third machines had been delivered, G. D. C. Leasing Corporation (G.D.C.) sent a purchase order for them to the seller with a view to leasing them to the buyer. No point is made of the separate identity of G.D.C., and we ignore it in this opinion.

"To Design and build" the first machine for $7,500, is dated January 9, 1964. The machine was delivered the following May and was paid for in June, 1964. There were many problems with it, and the parties and the buyer's parent company, Watts Regulator Company (Watts), worked together to solve them. In August, 1964, the seller by letter to the buyer listed twenty-eight "revisions in the next two valve setters to be built." The buyer ordered the second and third machines in October, 1964, for a total price of $14,950; they were delivered in December, 1964, and one of them was paid for in March, 1965. At the time of the second order, the first machine was sent back, modified to conform to the new design, then shipped back to the buyer and put into service.

Development and testing continued. In July, 1965, the buyer by letter told the seller it "would like to negotiate a price [for the third machine] which would take into account the amount of money and time that we have had to expend trying to perfect these devices." In August, 1965, the buyer told the seller that the third machine was useless and that the buyer would not pay for it unless it would meet a "plus or minus five per cent" specification. The seller then agreed to take back the third machine at the buyer's expense and to work on it. In January, 1966, representatives of the buyer went to the seller's plant to conduct a series of tests. The parties do not agree on the meaning of the specification or on what the tests showed. In February, 1966, the buyer notified the seller that it was reserving its rights for recovery of its losses and expenses, and that the third machine was unacceptable and would not be paid for.

1. *The governing law.* The seller is a Connecticut corporation with its principal place of business in Connecticut, and its correspondence with the buyer was conducted from Connecticut. The machines were delivered to the buyer's plant in New Hampshire. The buyer was wholly owned by Watts, located at Lawrence, Massachusetts; Watts was in effect the buyer's only customer, and the decisions to buy the machines were made by Watts. The parties agree that

the cases are governed by the Uniform Commercial Code as enacted in Massachusetts, G. L. c. 106 (hereafter UCC). The relevant statutory provisions in Connecticut and New Hampshire are substantially identical to those in Massachusetts. Conn. Gen. Sts. Anno. § 42a. N. H. Rev. Sts. Anno. c. 382–A.

2. *Acceptance and rejection.* "The buyer must pay at the contract rate for any goods accepted." UCC § 2–607 (1). The parties appear to agree that the buyer accepted the first two machines, but disagree as to whether the third machine was accepted or rejected. The seller argues that the second and third machines, which were ordered together, delivered together, tested together, and complained of essentially as a unit, together constituted one "commercial unit." Hence, it argues, UCC § 2–606 (2) applies: "Acceptance of a part of any commercial unit is acceptance of that entire unit." The seller relies on *National Wholesale Grocery Co. Inc.* v. *Mann,* 251 Mass. 238, 249, and *Heyman* v. *DeChristopero,* 259 Mass. 29, 31, decided under the Uniform Sales Act, former G. L. c. 106, § 37. That reliance is misplaced, since the Uniform Sales Act did not contain a provision like UCC § 2–601 (c) permitting the buyer, where goods are nonconforming, to "accept any commercial unit or units and reject the rest."

UCC § 2–105 (6) [2] defines "commercial unit" as a unit which "by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use." Point 1 of the sponsors' comment to § 2–601 elaborates: "The only limitation on partial acceptance is that good faith and commercial reasonableness must be used to avoid undue impairment of the value of the remaining portion of the goods. This is the reason for the insistence on the 'commercial unit' in para-

---

[2] "Section 2–105. . . . (6) 'Commercial unit' means such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole."

graph (c). In this respect, the test is not only what unit has been the basis of contract, but whether the partial acceptance produces so materially adverse an effect on the remainder as to constitute bad faith."

The buyer here first ordered one machine separately. Later, after the second and third machines were ordered and delivered together, the seller took the third back separately to work on it. There is no evidence that there was a commercial usage to treat two machines as a single whole or that division of a pair of machines materially impaired their character or value, or that acceptance of one produced a materially adverse effect on the other. In these circumstances, it could not be ruled as a matter of law that the two machines constituted a single commercial unit, or that one machine was not a commercial unit.

Alternatively, the seller argues that the buyer accepted the third machine by virtue of § 2-606 (1) (b) by failing to make an effective rejection under § 2-602 (1), which provides: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." We think this contention is correct. The buyer received the machine on December 22, 1964, and claims to have determined that it was nonconforming shortly thereafter. Notice of rejection was first given on February 2, 1966. As a matter of law, after delay of more than a year, the notification was not "seasonable," and the rejection was not "within a reasonable time." *Miron* v. *Yonkers Raceway, Inc.* 400 F. 2d 112, 118–119 (2d Cir.). *Ingle* v. *Marked Tree Equip. Co.* 244 Ark. 1166, 1173–1174. *Woods* v. *Van Wallis Trailer Sales Co.* 77 N. M. 121, 123. *Julian C. Cohen Salvage Corp.* v. *Eastern Elec. Sales Co.* 34 D. & C. 2d (Pa.) 705, 710, affd. 205 Pa. Super. 26. *Campbell* v. *Pollack*, 101 R. I. 223, 230. Compare under the Uniform Sales Act, *Moore* v. *Foss & Co. Inc.* 18 F. 2d 635, 637 (D. Mass.); *United States* v. *D. C. Loveys Co.* 174 F. Supp. 44, 47–48 (D. Mass)., affd. sub nom. *A. Belanger & Sons, Inc.* v. *United States,* 275 F. 2d 372 (1st. Cir.).

The buyer contends that the time for rejection was extended because the machine was complicated and purportedly one of the first of its kind, citing *Carlo Bianchi & Co. Inc.* v. *Builders' Equip. & Supplies Co.* 347 Mass. 636, 648–649, where we said that "use during the period when both parties were concerned with improving the plant signified only that the buyer would accept it if the attempted improvements proved efficacious." We pass the point that that case was decided under the Uniform Sales Act, and that under the Uniform Commercial Code it might be more appropriate to treat the problem as one of revocation of acceptance. Bianchi "discovered soon after its arrival that the plant was not operating properly and . . . notified Builders that no payments would be made until it was." About four months after delivery Bianchi made an unequivocal rejection. In the present case, in contrast, it was eight months before the buyer said it would not pay unless the machine met certain standards, and nearly six months more before notice of rejection was given. Of course, it is possible for a seller to deliver goods on the understanding that they can be returned at any time. *Cleary* v. *Barlow*, 252 Mass. 101, 104. UCC § 2–326 (1). But no such agreement was shown here.

3. *Revocation of acceptance.* Since the goods were accepted, the buyer had the burden of establishing breach. UCC § 2–607 (4).[3] If it met that burden, however, it could in proper circumstances revoke its acceptance under § 2–608.[4] It would then have the same rights and duties

---

[3] "Section 2–607. . . . (4) The burden is on the buyer to establish any breach with respect to the goods accepted."

[4] "Section 2–608. . . . (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it, and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it. (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

with regard to the goods as if it had rejected them. Thus the principal effects of acceptance are to shift the burden of proof and to subject the buyer's rights to the limitations stated in § 2–608. See *Miron* v. *Yonkers Raceway, Inc.*, *supra.* See also Note, Rejection or Revocation under the Uniform Commercial Code, 31 Ohio St. L. J. 151.

The buyer contends that it appears, either as a matter of law or sufficiently to raise questions of fact for the jury, that the machine was nonconforming, that the nonconformity substantially impaired its value to the buyer, that the case was well within the conditions of either the cure provision of § 2–608 (1) (a), or the nondiscovery provision of § 2–608 (1) (b), and that revocation and notice of revocation came within a reasonable time under subsection (2). We agree with the seller's contention that there is insufficient evidence that the alleged nonconformity substantially impaired the value of the machine to the buyer, and we need not discuss the other limitations on revocation of acceptance. Substantial impairment of value is essential. *Tiger Motor Co. Inc.* v. *McMurtry*, 284 Ala. 283, 291–292. *Lanners* v. *Whitney*, 247 Ore. 223, 233–234. *Rozmus* v. *Thompson's Lincoln-Mercury Co.* 209 Pa. Super. 120, 124–125. *Campbell* v. *Pollack*, 101 R. I. 223, 231–232.

The nonconformity on which the buyer relies for substantial impairment of value is failure of the machine to meet the plus or minus five per cent specification. The seller's president testified that when tested the machine met this requirement. The buyer's general manager, who left the buyer's organization in August, 1965, testified that the machines performed well and were used in production, that competitive valves would be far less accurate, in general, than those set by these machines, and that the five per cent specification was "unreal" and "meaningless." That testimony does not bind the buyer, but we are not directed to any testimony showing how and to what extent failure to meet the specification impaired the value of the machine. There was vague testimony that a valve set too low might become a nuisance and indirectly might bear on safety, and

that if set too high a valve might fail to function as a safety device to protect water heaters; but there was no showing of the bearing of the particular specification on these possibilities or on the manufacture or marketing of valves. On this issue the buyer had the burden of proof, and it failed to sustain that burden.

4. *Express warranties.* Since the buyer has accepted the goods and has not revoked the acceptance, the seller may recover the unpaid portion of the price. UCC § 2–709 (1) (a). But if the goods were nonconforming, the buyer may have an offsetting claim for damages. § 2–714. The buyer claims that there were breaches of express warranties, of an implied warranty of merchantability, and of an implied warranty of fitness for a particular purpose. The burden is on the buyer to establish such breaches. § 2–607 (4).

The buyer claims express warranties made in the seller's preliminary correspondence. On October 12, 1963, the seller wrote: "About the valve adjustment, we would shoot for a mean of 125 psi [pounds per square inch] and hit it more closely than an operator can. . . . With the air pressure sensing there is bound to be a gain in accuracy . . . . Probably a better statement is that the tolerance will be better than it is by the present method." Again, on October 19, 1963, the seller wrote: "With few reservations the automatic valve setter would be a turnkey operation. . . . We would set up the unit at your plant, check it out, train the people stated, and make whatever changes are then indicated to meet the specifications. . . . Failing to meet performance specifications under these guide lines you could ship back the unit with no charge other than freight to New Fairfield."

The buyer now asserts that these letters created express warranties by "affirmation of fact" and "promise," UCC § 2–313 (1) (a), that the machine would be a turnkey device and would be more accurate than the hand method. We think they savor more of prediction than of promise. The former general manager of the buyer understood a "turn-key device" to be "one which operates 100 per cent

from the day you receive it," as distinguished from a proto-type needing further development; he considered the first machine a "semi-experimental" prototype. The order for the first machine, dated January 9, 1964, was to design and build the machine "substantially as per" an attached inter-office letter of the buyer; that letter described the "auto-matic pressure setting procedure," referred to items which were "suggested," and closed with the following: "It is probable that some tolerances on this will have to be es-tablished but deviations from our basic specification can be determined when the machine is checked out." There was no "turnkey" warranty, and no warranty that the machine would be more accurate than the hand method.

The buyer also claims a breach of a warranty that the machine would set valves "entirely within the ± 5% range," quoting from the seller's letter of January 6, 1966. There was testimony that the buyer followed such a standard and that it was one of the specifications discussed between the parties and referred to in the letter of October 19, 1963. But the standard was not referred to in either of the pur-chase orders and was never written down with any pre-cision until after the meeting in August, 1965.

At that meeting the parties seem to have thought they had reached an oral agreement on the five per cent specifica-tion, to be used in reëvaluating the third machine after the seller had reworked it, but their subsequent correspondence disclosed two conflicting versions: the seller's version called for the machine "to set within the prescribed 5% range 90% of the valves presented for setting"; the buyer's ver-sion allowed the machine to reject no more than ten per cent of the valves capable of being set, but required *all* of the valves set to be within the five per cent range. The seller's letter of January 6, 1966, pointed out the discrepancy, said it believed "that our equipment will satisfy also the new criterion, but subject to these conditions." One of the con-ditions was that the buyer "define the quantity of valves which may be incorrectly set and passed. . . . We are con-fident that . . . the machine will set valves entirely within

the ± 5% range. Recognizing, however, the possibilities of mechanical aberration and therefore of 'strays,' we recommend as the standard that no more than 2% of the valves set by our machine as being within the ± 5% range may be rejected on the water test."

The buyer's representatives reported on January 12, 1966, that in tests made on January 10, 1966, the machine rejected twenty-four out of 452 valves (5.3%), set twenty-four more than five per cent too high (5.3%), and set eighteen more than five per cent too low (3.98%), a total of forty-two set out of tolerance range (9.3%). There was other testimony that all the valves in the test were set within the five per cent tolerance, and if the seller had agreed to the buyer's version of the five per cent specification, there would have been a question of fact whether the machine met the test. But there was no evidence that the seller agreed to the buyer's version, or that the buyer agreed either to the seller's original version or to its January 6, 1966, recommendation. In these circumstances, it cannot be said that the buyer carried its burden of establishing that its version of the five per cent specification became "part of the basis of the bargain" within UCC § 2–313 (1) (a).

5. *Implied warranties.* The buyer also argues that the machines carried an implied warranty of merchantability under UCC § 2–314, and an implied warranty of fitness for a particular purpose under UCC § 2–315. It contends that even though the machines "were allegedly the first of their kind . . . [they] were not 'fit for the ordinary purpose for which' they were used . . . ." We disagree with the buyer's contention that the ordinary purpose of the machines is to set valves accurately within a plus or minus five per cent tolerance. We are not directed to any evidence which proves the existence of any purpose other than merely setting valves. See *Robert H. Carr & Sons, Inc.* v. *Yearsley,* 31 D. & C. 2d (Pa.) 262, 264. It is not disputed that the machines were capable of setting valves, even if they did not operate accurately within a plus or minus five per cent tolerance. "The requirement when it exists that goods

shall be merchantable does not require that the goods shall be of first quality . . . ." Williston, Sales (Rev. ed. 1948) § 243, as quoted in *Whitin Mach. Works* v. *United States*, 175 F. 2d 504, 509 (1st Cir.).

Moreover, because the machines were "semi-experimental" prototypes they had no record of past use on which to base a determination of their ordinary purpose. There was no showing that the machines were not "such as pass without objection in the trade under the contract description," UCC § 2-314 (2) (a), for there was no trade in goods of the same kind.

As for warranty of fitness for a particular purpose, the buyer has not sustained its burden of proving that the seller had reason to know of the particular purpose at the time of contracting. UCC § 2-315. The buyer's former general manager testified that the goods were to be a "semi-experimental" prototype, and nothing was shown to the contrary. It was not shown that the buyer relied on the seller's skill or judgment to furnish suitable goods. Instead, the buyer was actively involved in designing the machine. Compare *Egyptian Chem. Co.* v. *General Prod. Co. Inc.* 229 F. 2d 263 (1st Cir.); *Skopes Rubber Corp.* v. *United States Rubber Co.* 299 F. 2d 584, 592 (1st Cir.). Consequently, we do not reach the question whether the sale of the second and third machines constituted a sale by sample or model within the purview of UCC § 2-316 (3) (b). See *Sal Metal Prod. Co. Inc.* v. *Rennert*, 5 Uniform Commercial Code Reporting Service, 826, 829 (N. Y. Sup. Ct. 1968).

*Exceptions overruled.*