709 F.2d 1109
 36 UCC Rep.Serv. 14, 14 Fed. R. Evid. Serv. 1705
 BINKS MANUFACTURING COMPANY, Plaintiff-Counterdefendant-Appellee,
v.
NATIONAL PRESTO INDUSTRIES, INC. and Presto Manufacturing
Company, Defendants- Counterplaintiffs-Appellants.
 No. 82-1609.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 29, 1982.
Decided May 20, 1983.
 
 Keith A. Klopfenstein, Jr., Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for defendants-counterplaintiffs-appellants.
 Roger Pascal, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff-counterdefendant-appellee.
 Before WOOD, COFFEY and TIMBERS,* Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 This appeal involves a contractual dispute concerning the manufacture and sale of an "industrial spray finishing and baking system." Binks Manufacturing Company, the System's manufacturer, brought an action in federal district court to collect the purchase price of the System. Presto Manufacturing Company,[1] counterclaimed alleging damages resulting from defective design and manufacture of the System as well as late delivery. The jury returned verdicts in favor of Binks on its purchase price claim and against Presto on its counterclaims. We affirm.
 
 I.
 
 2
 Presto is engaged in the manufacture and sale of electrical appliances, including hamburger cookers. Binks Manufacturing Company is a leading manufacturer of industrial spray finishing equipment. In 1975, Presto management decided to increase its production capacity of electric hamburger cookers and as part of its expansion plan, determined to purchase an automatic system designed to coat aluminum castings (the principal components of hamburger cookers) with a non-stick "teflon-like" coating for installation at its Alamogordo, New Mexico plant. Presto entered into negotiations with Binks Manufacturing Company for the design and manufacture of the system.
 
 
 3
 The negotiations between Binks and Presto continued from October 1975 through March 1976, resulting in a contract with Binks agreeing to manufacture "a custom designed, custom built automatic spray application and oven curing system intended to apply coatings to various Presto products" (hereinafter the "System"). The System was to consist of one continuous conveyor 858 feet long, designed to carry an aluminum casting through a six-step manufacturing process: (1) a booth in which the castings would be sprayed with a primer; (2) an oven where the primer would be baked on to the aluminum castings; (3) a cooling area; (4) a booth where the castings would be sprayed with a non-stick coating; (5) three progressively hotter ovens in which the non-stick coating would be baked on to the aluminum castings over the primer; and (6) a final cooling area.
 
 
 4
 One of the prime considerations in this lawsuit is the interpretation of the following provision of the contract pertaining to the System's maximum capacity:[2]
 
 
 5
 "DESCRIPTION
 
 
 6
 In accordance with your request, we are pleased to submit for your consideration, a revised quotation covering:
 
 
 7
 One Item of Equipment designed to coat any one of the following parts on one and/or both sides in quantities, as listed at the conveyor rate of 25 fpm with either 16 or 18 inch spindle spacing:
 
 
 8
 #60-001 * Upper Double Burger at (13 oz.) 1,125 pcs./hr.
#60-002 * Lower Double Burger at (24 oz.) 1,125 pcs./hr.
#60-003 * Upper Square Burger (9.5 oz.) 2,250 pcs./hr.
#60-004 * Lower Square Burger (12 oz.) 2,250 pcs./hr.
#60-121 * Upper Round Burger (7 oz.) 2,250 pcs./hr.
#60-120 Lower Round Burger (5 oz.) 2,250 pcs./hr.
#28-006 Fry Pan at 3.8#--Quantities as later
 established.
 
 
 9
 * Asterisk to indicate item coated on both sides. Hinges on 60-001 and 60-003 coated both sides.
 
 
 10
 The maximum capacity of the system is limited to the above parts or parts of similar size and cross section with a maximum loading of 4,500 pounds per hour and 4,500#/hr. of work holders, which would pass through each oven.
 
 
 11
 Maximum part size will be 12"' high X 18"' diameter." (emphasis added).
 
 
 12
 The contract also provided that shipment of the System to Presto's plant "will not be made later than June 2, 1976" and further states that "[t]ime is of the essence ...." On May 26, 1976, Binks informed Presto that shipment of the System could not be completed until mid-June of 1976, approximately two weeks later than the agreed upon delivery date. In reality, shipment of the System to Presto's Alamogordo, New Mexico plant was not accomplished until July 19, 1976. Binks' late delivery of the System was due to their inability to obtain timely delivery from the oven subcontractor, Radiant Products.[3] Radiant, in turn, attributed their late shipment to an unforeseen shutdown of a Radiant supplier's plant (U.S. Gypsum) and an unforeseen injury to a key Radiant employee.
 
 
 13
 Binks offered to supervise installation of the System, but Presto chose not to accept the offer and hired their own local independent contractors to install the System. According to Binks, Presto's independent contractors committed installation errors of major proportions, including a failure to properly align and anchor the conveyor equipment. Binks further contends that Presto insisted upon initially operating the System at maximum capacity, thereby ignoring Binks' advice that the System be brought up to full capacity only gradually.
 
 
 14
 After installation of the System had been completed, Presto personnel made several unsuccessful attempts to operate the System's conveyor. In the ensuing weeks representatives of Presto, Binks and Radiant[4] made other attempts to operate the System, but experienced a myriad of problems. Binks contends that Presto's independent contractors failed to properly synchronize the electric motors used to run the conveyor causing the conveyor to run sporadically and jam. These problems in conveyor synchronization continued for some two months causing the System to operate at less than half capacity.
 
 
 15
 Binks and Presto disagree as to the underlying cause of the System's faulty performance. Presto alleges that the System was defectively manufactured in that the conveyor, contrary to the contract specifications, was totally enclosed in the System's ovens, causing the conveyor components to overheat, contributing to the twisting, bending and eventually breakage of the conveyor chain.
 
 
 16
 Binks, on the other hand, contends Presto: (1) improperly installed the System; (2) inadequately lubricated the conveyor; (3) operated the System's oven at excessive temperatures; (4) ignored Binks' advice in initially operating the System at maximum capacity; and (5) ran defective castings through the System, resulting in pieces breaking off the castings and jamming the conveyor.
 
 
 17
 Binks also asserts that Presto abused the System by "double loading" the castings used to make upper components of the hamburger cookers, thereby exceeding the System's maximum capacity set forth in the contract. According to Binks, "double loading" the System resulted in twice as many upper burger castings being loaded into the System per hour as specified in the contract (2,250 "upper double burger" castings per hour instead of the 1,125 castings per hour outlined in the contract and 4,500 "upper square burger" castings per hour rather than 2,250 castings per hour set forth in the contract).
 
 
 18
 In early January of 1977, Richard Lavers, a Presto in-house attorney, traveled to their Alamogordo, New Mexico plant to interview plant personnel about the System's problems. Lavers thereafter summarized the information obtained in several "inter-office letters" dealing with Presto's problems. In a January 7, 1977 memorandum to James Bartl, Presto's General Counsel, Lavers set forth a recommended strategy to be employed in negotiations with Binks concerning the System's operational problems. In a January 21 "inter-office letter" to Bartl (Presto's General Counsel), entitled "Evaluation of Binks Situation," Lavers described a conversation he had had with three corporate officers of Presto, and recited in detail the mechanical problems Presto experienced in the operation of the System. A third memorandum dated January 25, 1977, sent by Lavers to Presto's Production Manager, consisted of a more detailed list of each of the System's malfunctions and the duration of each breakdown. The memorandum also contained Lavers' opinion as to the allocation of responsibility between Presto and Binks for each of the System's respective breakdowns.
 
 
 19
 In the months following Lavers' trip to Alamogordo, Binks and Presto made several unsuccessful attempts to reach a negotiated settlement and failing to achieve this, on November 4, 1977, Binks filed a complaint seeking recovery under the contract for the balance of the purchase price. Presto answered by filing a $9.5 million counterclaim against Binks alleging late delivery of the System, breach of contractual warranties, breach of implied warranties, negligence and misrepresentation in connection with the design, manufacture and sale of the spraying and baking system.[5]
 
 
 20
 In ruling on a Binks' discovery motion prior to trial, the district court found Attorney Lavers' (Presto's in-house counsel) January 7 memorandum protected from disclosure under the work-product doctrine, but did allow Binks to discover both the memoranda of January 21 and January 25 prior to trial, and subsequently allowed Binks to introduce these two memoranda into evidence during the trial. The case came to trial on March 1, 1982, and after the four-week jury trial, judgment was entered in favor of Binks on its claim for the balance of the purchase price and on the counterclaims for damages.
 
 
 21
 On appeal, Presto contends that the district court erred:
 
 
 22
 1. In granting Binks' pre-trial motion in limine, precluding Presto from introducing parol and extrinsic evidence to attempt to show that the parties intended to define the maximum capacity of the System in terms of pounds of castings per hour, rather than the number of castings per hour.
 
 
 23
 2. Second, in interpreting the law of excuse and waiver with regard to Presto's claim for late delivery of the System, allegedly resulting in a jury instruction misstating the law of excuse and waiver.
 
 
 24
 3. Third, in allowing Binks to discover and introduce into evidence Lavers' January 21 and January 25, 1977 memoranda which Presto contends were protected under the work product privilege.
 
 
 25
 4. Finally, in directing a verdict in favor of Binks on Presto's claim for breach of a warranty of merchantability, based on a finding that the System manufactured by Binks was "unique" as a matter of law.
 
 II.
 
 26
 THE MOTION IN LIMINE CONCERNING THE ISSUE OF MAXIMUM CAPACITY
 
 
 27
 Presto's counterclaim against Binks alleged that the System designed and manufactured by Binks was defective, resulting in repeated breakdowns and loss of production. Binks answered that the System's breakdowns were not a result of defective design or manufacture, but rather were caused by Presto's abuse of the System, particularly Presto's practice of "double loading" the System.
 
 
 28
 Therefore, to establish this "double loading" theory at trial, it became necessary to determine the System's "maximum capacity" as defined in the parties' contract. The parties agree that the following provision of the contract sets forth the System's maximum capacity:
 
 
 29
 "One Item of Equipment designed to coat any one of the following parts on one and/or both sides in quantities, as listed at the conveyor rate of 25 fpm with either 16 or 18 inch spindle spacing:
 
 
 30
 #60-001 * Upper Double Burger at (13 oz.) 1,125 pcs./hr.
#60-002 * Lower Double Burger at (24 oz.) 1,125 pcs./hr.
#60-003 * Upper Square Burger (9.5 oz.) 2,250 pcs./hr.
#60-004 * Lower Square Burger (12 oz.) 2,250 pcs./hr.
#60-121 * Upper Round Burger (7 oz.) 2,250 pcs./hr.
#60-120 Lower Round Burger (5 oz.) 2,250 pcs./hr.
#28-006 Fry Pan at 3.8#--Quantities as later
 established.
 
 
 31
 * Asterisk to indicate item coated on both sides. Hinges on 60-001 and 60-003 Note coated both sides.
 
 
 32
 The maximum capacity of the system is limited to the above parts or parts of similar size and cross section with a maximum loading of 4,500 pounds per hour and 4,500 #/hr. of work holders, which would pass through each oven."
 
 
 33
 Based on the foregoing contractual language, Binks takes the position that the "maximum capacity" of the System for the castings specified in the contract is defined in terms of the number of castings that the System can handle per hour consistent with the design of the machine. Presto, however, contends that extrinsic evidence concerning negotiation and performance of the contract demonstrates that the parties intended the maximum capacity of the System to be defined in terms of pounds of castings run through the System per hour; i.e., 4,500 pounds of castings per hour. Presto further argues, and Binks concedes, that Presto never loaded the System with more than 4,500 pounds of castings per hour.
 
 
 34
 Presto, in support of its contention that the parties intended the System's maximum capacity to be defined in pounds per hour, sought to introduce extrinsic evidence pertaining to the negotiation and performance of the contract.[6] On February 25, 1976, four days before trial, Binks presented a motion in limine seeking an order precluding Presto from presenting extrinsic evidence to show that the parties intended to define the maximum capacity of the System in terms of pounds per hour rather than number of castings per hour. After hearing arguments, the court ruled in favor of Binks on the motion in limine and stated:
 
 
 35
 "I conclude that so far as the six identified parts are concerned, the specified maximums of the system are those numbers appearing opposite each of the items [in the contract provision quoted above] and not the number of items which would aggregate 4,500 pounds."
 
 
 36
 Presto contends the court committed reversible error in ruling that Presto could not introduce extrinsic evidence to show that the parties intended to define the System's maximum capacity in pounds per hour.
 
 
 37
 In evaluating Presto's challenge to the district court's ruling, we must bear in mind that our role as an appellate court is not to consider a case de novo. Rather, our role in reviewing the district court's ruling on the motion in limine is limited as "decisions regarding the admission and exclusion of evidence are peculiarly within the competence of the district court and will not be reversed on appeal unless they constitute a clear abuse of discretion." Ellis v. City of Chicago, 667 F.2d 606, 611 (7th Cir.1981). This court recently stated:
 
 
 38
 "Under the abuse of discretion standard of review, the relevant inquiry is not 'how the reviewing judges would have ruled if they had been considering the case in the first place.' Beshear v. Weinzapfel, 474 F.2d 127, 134 (7th Cir.1973). Rather, 'an abuse of discretion is established only where no reasonable man could agree with the district court; if reasonable men could differ as to the propriety of the court's action, no abuse of discretion has been shown.' Smith v. Widman Trucking & Excavating, 627 F.2d 792, 795-96 (7th Cir.1980); see also Beshear v. Weinzapfel, 474 F.2d 127, 134 (7th Cir.1973)."
 
 
 39
 Washington v. Sherwin Real Estate, Inc., 694 F.2d 1081, 1087 (7th Cir.1982).
 
 
 40
 Guided by these principles, we turn to the issue of whether the court abused its discretion by precluding Presto from introducing extrinsic evidence to establish that the parties intended the System's maximum capacity for "Upper Double Burger" and "Upper Square Burger" castings to be defined in pounds per hour, rather than number of castings per hour. The admissibility of extrinsic evidence to interpret the contract in this case is governed by Ill.Rev.Stat. ch. 26, section 2-202 [Uniform Commercial Code section 2-202] which states:
 
 
 41
 "Final Written Expression: Parol or Extrinsic Evidence
 
 
 42
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
 
 
 43
 (a) by course of dealing or usage of trade or by course of performance; and
 
 
 44
 (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."
 
 
 45
 Thus, it is evident that under UCC section 2-202, evidence of a prior agreement or a contemporaneous oral agreement must be excluded if (1) the writing (here the contract between the parties) was intended as the final expression of the parties agreement with respect to the maximum capacity term; and (2) the proffered evidence contradicts or is inconsistent with the terms of the written contract. See Nordstrom, Law of Sales 161-66 (1970). It is evident from the record that both Binks and Presto agree that their written contract was intended to be the final expression of their agreement; therefore, the crucial question is whether the interpretation urged by Presto (i.e., that the parties intended the System's maximum capacity for "Upper Square Burger" and "Upper Double Burger" castings to be a function of pounds of castings per hour) contradicts or is inconsistent with the terms of the written contract.
 
 
 46
 Although the Uniform Commercial Code itself fails to delineate or set forth when extrinsic evidence contradicts or is inconsistent with written terms of a contract, this court recently defined "inconsistency" for the purpose of UCC section 2-202 as "the absence of reasonable harmony in terms of the language and respective obligations of the parties." Luria Bros. & Co. v. Pielet Bros. Scrap Iron, 600 F.2d 103, 111 (7th Cir.1979). Applying this definition of "inconsistency" to this case, it is clear that if the court were to allow the admission of extrinsic evidence tending to show that the maximum capacity of the System for "Upper Square Burger" and "Upper Double Burger" castings was defined in terms of pounds per hour it would necessarily lead to an "absence of reasonable harmony" between the terms of the written contract and the proffered extrinsic evidence of the parties' purported intent. Presto's theory that the System's maximum capacity for the upper burger castings was defined as 4,500 pounds of such castings per hour would render almost meaningless the express language of the written contract which, after reciting a specified number of each particular casting, states "the maximum capacity of the System is limited to the above parts ...." On the other hand, the district court's well reasoned interpretation of the written contract gave meaning to each and every provision of the contract; for each of the six castings listed, the maximum capacity of the System was defined in number of parts per hour, while for other unspecified castings which Presto might decide to run through the System in the future, the maximum capacity was defined in pounds of castings per hour. Thus, the court's decision to exclude the extrinsic evidence of the parties intent is amply supported by the basic principles of contract interpretation that a written contract should be given a construction that "harmonizes all the various parts" of the contract so that no provision is "conflicting with, or repugnant to, or neutralizing of any other." Zannis v. Lake Shore Radiologists, Ltd., 73 Ill.App.3d 901, 29 Ill.Dec. 569, 392 N.E.2d 126, 129 (1979).
 
 
 47
 Furthermore, the district court's decision to preclude Presto from introducing extrinsic evidence regarding the maximum capacity issue pays credence to the policy underlying the parol evidence rule as set forth in UCC section 2-202. This court in Luria Bros., 600 F.2d at 110 n. 5, stated:
 
 
 48
 "The parol evidence rule ... is a rule of substantive law. Evidence is excluded not because it is not credible or not relevant but because of a policy favoring the reliability of written representations of the terms of a contract."
 
 
 49
 This policy of upholding the integrity of written contracts and favoring written terms over extrinsic evidence is particularly relevant in cases of this nature involving a written contract between two large corporations presumably represented by competent counsel. Such parties should be held to the terms of their written contract whenever it is reasonable to do so, as it is incumbent upon courts to uphold the dignity of a contract whenever possible by preventing parol evidence from being used to negate the terms of written contracts. The First Circuit's words in Intern. Business Machines v. Catamore Enterprises, 548 F.2d 1065, 1073 (1st Cir.1976), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977) are particularly apt in this case.
 
 
 50
 "The morass of business dealings between two companies described on this record, their promises oral and written, the disparity of their understandings, the frustration of expectations, the inevitable recriminations and conflicting memories--all this is not unique, new, or infrequently encountered. The law in its effort to facilitate just resolutions of such controversies has, over the centuries, developed certain aids or guides to decision.... The first is the substantive principle that when, in the course of business transactions between people or corporations, free and uncoerced understandings purporting to be comprehensive are solemnized by documents which both parties sign and concede to be their agreement, such documents are not easily bypassed or given restrictive interpretations."
 
 
 51
 Additionally, as this lawsuit involved a lengthy and complicated fact situation, admitting extrinsic evidence would have increased the possibility of unnecessarily confusing the jury, a possibility section 2-202 is designed to avoid:
 
 
 52
 "But the way [section 2-202] is worded, the trial is certainly not to be a free-wheeling affair in which the parties may introduce before the jury all evidence of terms, including the writing, with the jury then to decide on terms. Rather, it is plain from the rule and from prior history of similar rules that some of the evidence is to be heard initially only by the judge and that he may invoke the rule to keep this evidence from the jury."
 
 
 53
 White & Summers, The Law Under the Uniform Commercial Code 77 (2d ed. 1980). See also McCormick, The Parol Evidence Rule as a Procedural Device for Control of the Jury, 41 Yale L.J. 365 (1932).
 
 
 54
 In summary, we conclude that the district court's order barring Presto from introducing extrinsic evidence regarding the intended maximum capacity of the System was not an abuse of discretion as it properly held the parties to the written terms of their contract, accorded with the basic principle of law favoring the dignity of a written contract, and avoided unnecessarily confusing the jury.
 
 III.
 INSTRUCTIONS ON EXCUSE AND WAIVER
 
 55
 In its counterclaims against Binks, Presto sought, inter alia, consequential damages allegedly suffered as a result of Binks' late delivery of the System. Binks defended against the late delivery counterclaim on the grounds that the delay in delivery of the System was excused because of Radiant's (the oven subcontractor) inability to deliver the ovens on schedule, resulting from an unforeseen shutdown of a Radiant supplier's plant (U.S. Gypsum) as well as the unforeseen injury to a key Radiant employee. Binks further defended against Presto's counterclaim for late delivery by alleging that, in failing to object to late delivery until several months after delivery was completed, Presto acquiesced in late delivery of the System, thereby waiving its right to seek damages. After being instructed on the law of excuse and waiver, the jury returned a verdict in favor of Binks, absolving it of liability for the late delivery. On appeal, Presto asserts that the district court's instructions to the jury were erroneous as they misstated the law of excuse and waiver.
 
 
 56
 The standard of appellate review of jury instructions is limited; "in reviewing the adequacy of jury instructions, they are to be construed in their entirety and not judged in artificial isolation." United States v. Hansen, 701 F.2d 1215 at 1218 (7th Cir.1983). This court recently stated:
 
 
 57
 "... We consider all that the jury heard and ... decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.' "
 
 
 58
 Tikalsky v. City of Chicago, 687 F.2d 175, 180 (7th Cir.1982) quoting Alloy Int'l Co. v. Hoover-NSK Bearing Co., Inc., 635 F.2d 1222, 1226-27 (7th Cir.1980). Similarly, the court in Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir.1982), phrased the standard of review of jury instructions in the following words:
 
 
 59
 "In assessing the jury instructions, consideration must be given to the charge as a whole so as to determine whether it is misleading or incorrectly states the law to the prejudice of the objecting party. E.g., Hlodan v. Ohio Barge Line, Inc., 611 F.2d 71 (5th Cir.1980). When the instructions, taken together, properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism. Vicksburg Furn. Mfg., Ltd. v. Aetna Cas. & Sur. Co., 625 F.2d 1167, 1169 (5th Cir. Unit A 1980). An erroneous instruction is not otherwise reversible unless the court is 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.' Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir.1981)."
 
 
 60
 The court's instruction on excuse, which Presto challenges (one small part of a total jury charge covering 40 pages of typed transcript) began by quoting verbatim the portion of the parties' contract pertaining to excuse for late delivery:
 
 
 61
 "in the event seller's failure is due to acts of God, strikes or other similar circumstances beyond his control, the required delivery date or dates shall be extended by the number of days delay [due] to such circumstances up to a maximum of 30 days, after which time buyer has prerogative of cancelling this order without obligation or of giving further extension of the delivery date."
 
 The district court continued by stating:
 
 62
 "With respect to excuse, you've heard the arguments and the evidence as to the reasons why the delivery was late.
 
 
 63
 You will have to decide whether those reasons fall within the language I have just read to you, which is: 'If seller's failure is due to acts of God, strikes, or other similar circumstances beyond his control, the required delivery date shall be extended' and so forth.
 
 
 64
 And you've heard the reasons why there was a delay."
 
 
 65
 Presto argues, in broad and vague terms, that the above-quoted jury charge was improper as it "left a clear contractual provision to be the subject of contrary interpretation by the jury," without specifying in any way how or why these instructions were prejudicial. This argument is without merit as Presto has failed to show that "the jury was misled in any way" by the district court's instruction on excuse. Tikalsky, 687 F.2d at 180. Similarly, we need not discuss in detail Presto's argument concerning the instructions on waiver[7] as there is nothing in the record demonstrating that these instructions misled or confused the jury in any manner. In summary, considering the court's jury instructions "in their entirety" rather than "in artificial isolation," Hansen, at 1218, we find no evidence in the record that the jury was misled on the law of excuse or waiver, nor are we "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberation." Johnson, 671 F.2d at 1280. Accordingly, we reject Presto's challenge to those instructions.
 
 IV.
 THE WORK PRODUCT PRIVILEGE
 
 66
 Presto next argues that the district court erred in allowing Binks to discover and introduce into evidence two letters dated January 21 and January 25, 1977 written by Richard Lavers, Presto's associate resident counsel. Presto asserts that the two documents are protected from disclosure under the attorney's work product privilege. The January 21 letter, entitled "Evaluation of Binks Situation" was addressed to Presto's chief in-house counsel, while the January 25 document containing Lavers' opinion as to the allocation of responsibility for each of the System's respective breakdowns, was sent to Presto's Production Manager.
 
 
 67
 It is axiomatic that in order to invoke the protection of the work product privilege, one must show that the materials sought to be protected were prepared "in anticipation of litigation ...." Fed.R.Civ.P. 26(b)(3). Thus, the threshold determination in any case involving an assertion of the work product privilege, including this case, is whether the materials sought to be protected from disclosure were in fact prepared in anticipation of litigation. The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad. Rather, as the court stated in Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 604 (8th Cir.1977):
 
 
 68
 "[T]he work product rule does not come into play merely because there is a remote prospect of future litigation.
 
 
 69
 In 8 Wright & Miller [Federal Practice & Procedure, Civil, Section 2024] it is said:
 
 
 70
 ... Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." (emphasis added).
 
 
 71
 Similarly, we find persuasive the court's reasoning in Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C.1982):
 
 
 72
 "The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery. As stated in Soeder v. General Dynamics Corp., 90 F.R.D. 253 (D.Nev.1980) the distinction between whether defendant's 'in house' report was prepared in the ordinary course of business or was 'work product' in anticipation of litigation is an important one. 90 F.R.D. at 255. The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in house' report as work product.... A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business. Some recent cases have suggested the need for objective facts establishing an identifiable resolve to litigate prior to the investigative efforts resulting in the report before the work product doctrine becomes applicable. See e.g. Fine v. Bellefonte Underwriters Insurance Co., 91 F.R.D. 420 (S.D.N.Y.1981); Atlanta Coca-Cola Bottling Co. v. Trans America Ins. Co., 61 F.R.D. 115 (N.D.Ga.1972). While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation."
 
 
 73
 The court in Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 865 (D.C.Cir.1980) held that the party seeking to assert the work product privilege has the burden of proving that "at the very least some articulable claim, likely to lead to litigation, [has] arisen."
 
 
 74
 To determine whether Attorney Lavers' in-house memoranda of January 21 and January 25 fall within the scope of the work product privilege, it is necessary to examine the events leading up to Lavers' trip to the Alamogordo, New Mexico plant, in particular the correspondence between Binks and Presto immediately preceding Lavers' trip. On December 10, 1976, Burke Roche, president of Binks, sent an eight-page letter to E.F. McCaghy, a Presto vice-president, requesting full payment of the System's purchase price. The letter stated:
 
 
 75
 "The full purchase price of the equipment is now due and owing, in fact long overdue.... Thus, there is immediately due to us the sum of $141,022.00 and we expect and would appreciate full payment of this entire sum within fifteen days of date.
 
 
 76
 * * *
 
 
 77
 * * *
 
 
 78
 Binks had made a valiant effort to resolve all problems related to this coding installation, whether related to Binks equipment or other problems not of our making, and we have expended time and effort far in excess of our normal start-up services. We have had good cooperation from your personnel at Alamogordo throughout this time.
 
 
 79
 However, we must now look to the future and put any continuing relationship on a proper business-like basis."
 
 
 80
 * * *
 
 
 81
 * * *
 
 
 82
 [I]f you persist in the unwarranted view that the equipment supplied under the quotation does not meet specifications and is not acceptable, please inform us immediately as we have no other recourse but to make arrangements to dismantle and remove the equipment."
 
 
 83
 Nowhere in this letter does Binks threaten Presto with litigation regarding the System. Rather, Binks stated that if Presto did not tender full payment, Binks would "dismantle and remove the equipment," and implied that they would leave the next move up to Presto.
 
 
 84
 On December 22, 1976, Presto's vice-president, McCaghy, responded by letter to Binks' earlier correspondence. This letter stated inter alia:
 
 
 85
 "Unless you affirmatively indicate your intention by December 27 to take immediate steps to satisfactorily cure these non-conformities, we shall send a team of our own experts to Alamogordo. Should you wish to participate in this corrective work or provide advice or assistance to our efforts, please advise so that we can make the necessary arrangements. Your expertise and participation is solicited to minimize the possibility of unnecessary false start-ups and to ensure that there will be no objection to the amounts for labor, material and other costs to be debited your account. If you wish to perform the work yourself, please advise us by the 27th.
 
 
 86
 * * *
 
 
 87
 * * *
 
 
 88
 In the interests of handling this matter in an expeditious fashion, may we suggest that you respond to our specific questions and then we could discuss the matter further once the equipment is in good operational order.
 
 
 89
 It should be specifically noted that your proposed avenues of resolving this matter are not available. We have already indicated that we shall withhold further payment to set off against our damages. Arrangements will not be made to dismantle and remove the equipment, as at this point we have no choice but to keep the equipment and try to make it operate properly. Lead time on substitute equipment is on the order of 15 months, and the combined costs of disassembly and removal, and damages from loss of production for such a period of time, would probably be beyond the absorption capability of your company. It is to your advantage as well as ours to have this equipment in proper working order as soon as possible. If you persist in your choice not to make the necessary corrections, we shall have to proceed on our own and continue to hold you fully responsible for any damages and expenses incurred."
 
 
 90
 Although the tone of Presto's letter is more threatening than Binks' letter, it still falls short of stating that Presto intended to institute litigation concerning the System. Rather, the letter clearly states that Presto still intended to persuade Binks to correct the problems in the System and, falling short of that, to withhold full payment of the purchase price of the System. Moreover, the letter stated that the purpose of the trip to Alamogordo was to attempt to correct the mechanical problems with the System, and not to prepare for litigation.
 
 
 91
 It is often difficult to determine with precision when a particular attorney's work is "in anticipation of litigation" rather than "an investigative report developed in the ordinary course of business." Janicker, 94 F.R.D. at 650. We conclude though, that while there may have been "the remote prospect of litigation" when Lavers prepared his memoranda, the appellant has failed to meet its burden of proving that the memoranda were "prepared ... because of the prospect of litigation," Diversified Industries, 572 F.2d at 604 (emphasis added), or, that "some articulable claim, likely to lead to litigation," Coastal States Gas Corp. 617 F.2d at 865 (emphasis added), had arisen. Therefore, we hold that Presto failed to meet its burden of proof necessary to invoke the work product privilege for the January 21 and January 25 memoranda.[8]
 
 
 92
 Furthermore, even were we to conclude that the district court erred in ruling that the January 21 and January 25 memoranda were unprotected under the work product privilege (which we do not), we believe any such error would not so substantially affect Presto's rights as to rise to the level of reversible error. As this court stated in Intern. Merger & Acg. Cons. v. Armac Enterprises, 531 F.2d 821, 823 (7th Cir.1976):
 
 
 93
 "It is also clear that a claim of error at trial may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is thereby affected. These rules are binding upon us, and, as a matter of federal practice, are to guide our resolution of the various contentions presented. In general, the question of whether error is 'harmless' or insubstantial is to be resolved in the context of the individual case. Where it appears that error in no way influenced the jurors, or had only a slight effect on them, the verdict and judgment are to be affirmed." (citations omitted) (emphasis added).
 
 
 94
 Our review of the record leads us to conclude that the disclosure and admission into evidence of the January 21 and January 25 memoranda had, at best, a slight effect upon the decision of the jury, and was not of such great impact to rise to the level of prejudicial error. The memoranda contained information largely cumulative of other evidence presented to the jury and were merely two exhibits of a total of well over one hundred exhibits introduced into evidence.[9] Based on our review of the voluminous record in this case, it is clear to this court that the jury had ample evidence, apart from Lavers' two memoranda, to support its verdicts in favor of Binks. Accordingly, we hold the district court did not err in compelling disclosure and admitting into evidence the January 21 and 25 memoranda and, any prejudicial effect of such disclosure and admission, even if erroneous, did not affect "the substantial rights of Presto," Intern. Merger, 531 F.2d at 823, and therefore was harmless and insufficient to justify reversal of the jury's verdicts in favor of Binks.
 
 V.
 
 95
 DIRECTED VERDICT ON THE WARRANTY OF MERCHANTABILITY CLAIM
 
 
 96
 Presto's final argument is that the district court erred in granting, at the close of presentation of Presto's case, a directed verdict in favor of Binks on Presto's counterclaim for breach of an implied warranty of merchantability. The district court reasoned that in order to prove the existence of a warranty of merchantability under Ill.Rev.Stat. ch. 26, section 2-314(2) [UCC section 2-314(2) ],[10] Presto had the burden to demonstrate that the System was not "fit for the ordinary purposes for which such goods are used," which in turn required a showing that there existed an "ordinary purpose" for the System. Since the evidence showed that the System was unlike any other that had previously been manufactured, the court concluded that there was no "ordinary purpose" for the System and thus no implied warranty of merchantability could exist.
 
 
 97
 The evidence introduced at trial established that, at least as far as any witness could ascertain, the System was designed and manufactured at Presto's request to operate the longest conveyor ever built, and thus, the custom-built System was more sophisticated than anything Binks had ever designed or manufactured.
 
 
 98
 In Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d 416 (6th Cir.), cert. denied, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981), the court was presented with a fact situation similar to the instant case. Price Bros. involved a suit arising from the manufacture and sale of a sophisticated pipe wrapping machine which failed to perform as represented by its manufacturer. The district court found in favor of the purchaser-plaintiff on a breach of warranty of merchantability theory, and the Sixth Circuit reversed, holding:
 
 
 99
 "Where there is '... no trade for an experimental machine and no proof or evidence pointing to a record of past years on which a determination of its ordinary purpose could be found, there is no implied warranty created in the instance.' 3 A. Squilliante & J. Fonseca, Williston On Sales 81, section 1809 (4th ed. 1974), citing, Axion Corp. v. G.D.C. Leasing Corp., 359 Mass. 474, 269 N.E.2d 664 (1971).
 
 
 100
 In the present case, the parties' skill and knowledge in matters relating to their transaction were essentially equal. They contracted for the sale of components to be installed in a highly complex piece of machinery. The components had never before been used in machinery of that type. The specific machinery was itself new and had never been operated with or without the components. In these circumstances no average or usual standards for determining ordinary performance or quality for the components can be determined, and no warranty of merchantability arises from the transaction. Therefore, the trial court's conclusion that Philadelphia Gear breached a warranty of merchantability was error."
 
 
 101
 Id. at 424 (emphasis added). Similarly, this case involves two sophisticated business entities whose skill and knowledge in matters relating to the business transaction at arm's length were essentially equal. The parties contracted at arm's length for the design and manufacture of an industrial baking and spraying system larger and more complex than any previously manufactured. We conclude that the court did not err in finding that the System was unique and therefore no warranty of merchantability could arise in this case.
 
 CONCLUSION
 
 102
 We agree with the rulings of the trial court and hold that: (1) the district court did not err in precluding Presto from introducing extrinsic evidence to attempt to prove that the parties intended the maximum capacity of the System to be defined solely in terms of pounds of castings per hour; (2) the district court properly instructed the jury on the law of waiver and excuse pertaining to Presto's counterclaim for late delivery; (3) the trial court did not err in compelling disclosure of and admitting into evidence Lavers' January 21 and January 25 memoranda; and (4) the district court did not err in directing a verdict for Binks on Presto's warranty of merchantability counterclaim. Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable William H. Timbers, Circuit Judge for the United States Court of Appeals for the Second Circuit, is sitting by designation
 
 
 [1]
 A wholly-owned subsidiary of National Presto Industries, Inc
 
 
 [2]
 The provisions quoted above were part of the "sales quotation" to Presto dated March 12, 1976. The trial court found this sales quotation to be an offer which Presto accepted and thereby became the contract. The parties do not challenge this finding
 
 
 [3]
 Although the contract does not so state, the record indicates that the parties understood that the System's ovens were to be supplied to Binks by the Radiant Products Company. The record discloses that Presto was aware of this since during negotiations pertaining to the design of the System, Presto representatives had met with Radiant personnel to discuss materials to be used in construction of the ovens
 
 
 [4]
 Although the record is not entirely clear on this point, it appears that Binks' and Radiant's representatives were called to the Alamogordo, New Mexico plant after the System failed to operate on August 4
 
 
 [5]
 Presto also filed a third-party complaint against Radiant Products Company, the manufacturer of the ovens used in the System and Reliance Electric Company, the manufacturer of the electric motors used in the System. Radiant, in turn, sued New York Blower Company which sold certain shafts and fans to Radiant for inclusion in the ovens. All third-party claims were settled before trial, leaving only the claims of Binks and Presto against one another
 
 
 [6]
 This extrinsic evidence included inter alia: (1) a quotation submitted by Binks several days prior to formation of the contract stating "approximately 4,500 pounds of aluminum work pieces ... will pass through each oven per hour;" (2) a March 9, 1976 letter from Binks' project engineer to Presto reciting "The System capacity increased from 1500 to 4500 # /Hr.;" and (3) that Binks participated in designing the work holders in which castings were placed, and allowed for "double loading" of castings
 
 
 [7]
 The portion of the district court's instruction on waiver challenged by Presto in this appeal reads:
 "On the other hand, if you find that Presto's actions were inconsistent with an allegation of breach, all the things that happened, the conversations that took place, the manner in which they proceeded to accept and erect and operate, et cetera, if you find all that is inconsistent with an intention to assert the breach, then you may find a waiver."
 
 
 [8]
 We disagree with Presto's argument that the trial court's ruling that Lavers' January 7 memorandum was protected under the work product privilege "eliminates any question as to whether the January 21, 1977 and January 25, 1977 memoranda were prepared in contemplation of litigation." Although the validity of the trial court's ruling regarding the January 7 memorandum is not before us in this appeal, were we required to decide whether or not the January 7 memorandum was protected, we would conclude, as we have concerning the January 21 and 25 memoranda, that the memorandum was not prepared in anticipation of litigation and thus not protected under the work product privilege
 
 
 [9]
 Presto voluntarily produced a memorandum written by one of its accountants detailing his opinion as to the respective responsibility of Binks and Presto for each of the System's malfunctions. While we recognize that the jury may have viewed Lavers' memoranda as more persuasive since they were written by an attorney, we believe that the cumulative nature of the information contained in Lavers' memoranda sufficiently minimizes the prejudicial effect of the evidence's introduction
 
 
 [10]
 Ill.Rev.Stat. ch. 26, section 2-314(2) recites:
 "(2) Goods to be merchantable must be at least such as
 (a) pass without objection in the trade under the contract description; and
 (b) in the case of fungible goods, are of fair average quality within the description; and
 (c) are fit for the ordinary purposes for which such goods are used; and
 (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
 (e) are adequately contained, packaged, and labeled as the agreement may require; and
 (f) conform to the promises or affirmations of fact made on the container or label if any."